IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 21-304 |
| JAMES TURNER | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by its attorneys, Jennifer Arbittier Williams, United States Attorney for the Eastern District of Pennsylvania, and Louis D. Lappen, Deputy United States Attorney for the District, hereby submits its sentencing memorandum in the above-captioned case.

**I.      PRELIMINARY STATEMENT**

Defendant James Turner abused the trust placed in him as a manager in SEPTA's Bridges and Buildings Department by engaging in a fraud scheme with SEPTA vendors that provided him with thousands of dollars in ill-gotten gains. While Turner certainly did not originate the scheme and was not one of the most culpable participants in the scheme, he took advantage of a criminal opportunity when it was presented to him. He also engaged in the fraud repeatedly, obtaining numerous items from the corrupt vendors over a three-year period. There was no excuse for this criminal behavior. Turner was a well-paid SEPTA manager and supervisor who should have known better. Considering the criminal activity of all the participants in this fraud scheme, the scheme cost SEPTA, under the most conservative estimates, almost $900,000 and did tremendous monetary

and psychic damage to SEPTA, its employees, and the citizens who fund SEPTA through the payment of taxes and ridership fares.

Turner was also one of the last defendants involved in this scheme to admit his misconduct and agree to plead guilty. Instead, he repeatedly lied and denied involvement in the scheme. After the government executed a search warrant at his residence and found numerous items he obtained as part of the fraud scheme (including a dog and dog supplies, a ring doorbell system, a refrigerator, electronic equipment, and designer sunglasses and clothes). The defendant's advisory guideline range of 8-14 months falls in Zone B, allowing for flexibility in fashioning a sentence that may include imprisonment as set forth in the Presentence Investigation Report. PSI ¶ 95.  Given the seriousness and scope of the fraud scheme, and the defendant's initial refusals to accept responsibility, the government recommends a sentence of imprisonment within the advisory guideline range.

II.     **SUMMARY OF THE CRIMINAL ACTIVITY**

The charges in this case arose from the defendant's participation in a fraud and bribery scheme involving managers in the Bridges and Buildings Department ("BBD") of the Southeastern Pennsylvania Transportation Agency ("SEPTA") and vendors who supplied products to the BBD. The BBD is responsible for maintenance, construction, and rehabilitation work performed at various SEPTA locations. Several SEPTA managers in the BBD used their SEPTA-issued credit cards ("P-Cards") to defraud SEPTA by obtaining cash and personal products from vendors who supplied goods to SEPTA. To

2

cover the cost of the products and cash provided to SEPTA employees, the vendors billed SEPTA for products that the vendors did not provide to SEPTA. The vendors generally billed SEPTA as much as double the amount provided to the corrupt managers so they could share in the criminal proceeds. The vendors provided the cash and products to SEPTA managers for two reasons: (1) to generate and share fraud proceeds with the SEPTA managers; and (2) to maintain and increase business from SEPTA. The total loss to SEPTA is approximately $900,000.

Among the different participants in this scheme, there were varying levels of conspiratorial activity and engagement with others. The guideline and other stipulations in Turner's case, and in the cases of the other participants in the scheme, reflect each participant's role in the scheme and engagement with other participants. Turner was a Maintenance Manager in SEPTA's BBD, supervising lower-level employees who performed maintenance work at SEPTA's facilities. Turner participated in this scheme by obtaining approximately $20,512 in personal products from vendors that were fraudulently billed to SEPTA, resulting in approximately $27,650 in losses to SEPTA.

    A.  **General Background Facts**

SEPTA is a metropolitan transportation authority providing rail, trolley, and bus services to passengers within Philadelphia, Pennsylvania, and the surrounding counties as well as service between the States of Delaware and New Jersey. SEPTA is an organization, and an agency of a state government, which received annual benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies, loans,

guarantees, and other forms of federal assistance. In fact, in each of the years of the charged fraud, SEPTA received well over $100 million from federal sources.

Throughout the time of the fraud discussed in this memorandum, SEPTA issued "procurement cards," also known as P-Cards, which operated as SEPTA credit cards, to managers working in SEPTA's BBD. The managers worked at various jobsites where SEPTA facilities were under construction for rehabilitation and renovation. SEPTA had established written rules and procedures that were provided to these employees concerning the use of these cards.

SEPTA rules allowed the P-Cards to be used for legitimate business reasons to purchase materials and equipment for jobsites when there was an emergency need for those materials and equipment that were not available in SEPTA's stock system. Under SEPTA rules, most materials for a jobsite should have been purchased in advance of the project through the purchase order process. The SEPTA Procurement Card Procedures Manual ("the Manual") specifically provided that the procurement card program was "not an alternative to, nor is it intended to circumvent, the normal procurement policies and procedures."

Consistent with the purpose of the procurement cards, beginning in 2017, the Manual further limited the use of the cards to (1) $1,000 for a single transaction; (2) $4,000 for daily purchases; (3) and no more than four transactions per day. Employees were not permitted to artificially break up purchases to hide violations of the rules, e.g., by making multiple purchases to avoid crossing the $1,000 threshold, also known as

4

"fragmenting." Prior to 2017, these limits were lower, *i.e.,* $500 for a single transaction and $2,000 for daily purchases.

### B. The Fraud Activity

#### 1. The Overall Scheme

For many years, beginning around 2013, SEPTA managers with the BBD engaged in a fraud and bribery scheme with particular SEPTA vendors to defraud SEPTA by abusing SEPTA's P-Card system. The vendors provided SEPTA managers with cash and merchandise in exchange for vendors billing SEPTA for products that the vendors did not provide. The vendors shared in the proceeds of the fraud.

The two primary vendors involved in this fraud were MSI Tool Repair and Supply and AM Services and Supplies (collectively referred to here as "MSI") and Advantage Industrial Supply ("AIS"). SEPTA records show that MSI was the highest biller on the SEPTA P-cards. From 2010 through 2019, MSI billed SEPTA approximately $3.7 million for products and tool repair services. The third highest biller during this period was AIS, charging SEPTA $1.9 million for industrial supplies. MSI was owned and operated by Mark Irvello. AIS was owned and operated by Stanley Woloff. Both Irvello and Woloff are charged in related cases.

The scheme began around 2013 when David Abell separately agreed, first with Mark Irvello of MSI, and then with Stanley Woloff of AIS (collectively "the vendors"), to engage with each of them in a fraud and bribery scheme against SEPTA. Abell agreed with the vendors that the vendor would provide Abell with regular cash payments for

5

Abell's personal benefit and that the vendor would falsely bill SEPTA through the P-Card system for items that the vendor was not providing to SEPTA. The false charges would cover the cash payments to Abell plus as much as double that amount to provide an equal share of fraud proceeds for the vendor.

Abell and the vendors understood and agreed that the vendors would make these cash payments to Abell not only to generate fraud proceeds for themselves, but also to maintain and grow the vendors' business with SEPTA. As part of this understanding and agreement, Abell purchased goods for SEPTA from MSI and AIS and encouraged and directed other SEPTA managers and employees in the BBD, including Turner, to make purchases from MSI and AIS. Those managers and employees followed Abell's direction and made purchases from MSI and AIS without necessarily knowing why they were encouraged to use these vendors.

After agreeing to engage in this scheme, Abell regularly solicited and demanded cash payments from the vendors. Irvello and Woloff then regularly provided cash to Abell, generally in amounts between $1,000 and $2,000 per month. The vendors then charged the P-Cards of SEPTA managers for numerous items that they did not provide to SEPTA to cover the cash they gave to Abell and to generate substantial fraud proceeds for themselves.

Abell identified for the vendors the items for which to charge SEPTA on the P-Cards to make the charges appear legitimate and conceal the fraud from SEPTA and authorities. Specifically, at Abell's direction, the vendors then billed SEPTA for products

that SEPTA might use, but in fact, did not need at that time. Similarly, at Abell's direction, the vendors also billed SEPTA for products that they did provide to SEPTA, but billed SEPTA for substantially more of those products than they actually provided. The vendors thus combined legitimate with fraudulent billing, making the scheme difficult to detect.

Working with Abell and other BBD managers, the vendors used the managers' P-Cards interchangeably to make it easier to generate fraud proceeds and bill SEPTA without exceeding the transactional limits on the individual P-Cards. The vendors thus used any manager's P-Card for transactions without regard for who was making a purchase or engaging in fraud with them.

Irvello and Woloff provided Abell with cash payments on a regular basis, approximately twice per month, from in or about 2013 until Abell left the employment of SEPTA on or about May 25, 2016.

Approximately one year before Abell left the employment of SEPTA, he retired from his position as Senior Director of Maintenance and became a contractor for SEPTA, continuing to work in SEPTA's BBD as he did as a manager. SEPTA replaced Abell with Rodney Martinez, making Martinez the new Senior Director of Maintenance. Abell trained Martinez in his new position and introduced Martinez to the cash-payment aspect of the fraud scheme.

Irvello and Woloff then made regular cash payments to Abell and Martinez and continued to falsely bill SEPTA for products that they did not provide to SEPTA, as

7

described above. The false billing covered the cash payments to Abell and Martinez and provided fraudulent proceeds for the vendors.

Several other SEPTA BBD managers, including Turner and those identified in paragraph 9 of the information, engaged in similar fraud activity with Irvello and Woloff. Those managers solicited the vendors for cash and personal items at no cost to the SEPTA managers. The vendors agreed to provide the cash and personal items to the managers, and as the parties further understood and agreed, the vendors fraudulently billed SEPTA to cover the cost of those payments and products and to generate additional fraud proceeds for the vendors.

From in or about 2013 through in or about 2019, Irvello and Woloff, through their companies, each became one of SEPTA's largest billers on the P-Card. In doing so, Irvello defrauded SEPTA of more than $540,000, and Woloff defrauded SEPTA of more than $330,000.

2. <u>Defendant James Turner's Involvement in the Scheme</u>

In 2016, Turner began to participate in the fraud scheme against SEPTA. Turner separately asked both Irvello and Woloff to provide him with personal products at no cost to Turner. Irvello and Woloff agreed to provide Turner with those personal products. Turner and the vendors understood and agreed that the vendors would use the SEPTA P-Cards to fraudulently bill SEPTA for those personal products and generate additional fraud proceeds for the vendors.

From in or about July 2016 through in or about July 2019, as part of this scheme,

Turner obtained from Irvello approximately 65 personal products and services that Irvello fraudulently billed to SEPTA through the P-Card system. The total value of those products and services was approximately $20,512, resulting in approximately $27,650 in fraudulent billing to SEPTA. The products and services included, among others, the following: a refrigerator, a clothes dryer, a Whippet dog and pet supplies, Beats headphones, Apple AirPods, a computer printer, a watch, an Xbox One X console, an Echo Show and Ring video doorbell system, a Bose Wave music system, Rayban sunglasses, Bowflex exercise equipment, automobile parts and tires, automobile repairs, various tools, and designer clothing, including UGG slippers, North Face jackets, and multiple pairs of Nike sneakers.

### III. STATUTORY MAXIMUM PENALTIES

The Court may impose the following statutory maximum sentences: Count One (theft from an organization receiving federal funds), 10 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment; and Count Two (wire fraud), 20 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment.

Total Maximum Sentence is: 30 years' imprisonment, a three-year period of supervised release, a $500,000 fine, and a $200 special assessment.  Full restitution of $27,650 also shall be ordered.  Forfeiture of $20,512, which represents all proceeds the defendant obtained from the offenses, also shall be ordered.

### IV.  SENTENCING GUIDELINES

The government agrees with the guideline calculation set forth in the Presentence Investigation Report ("PSR") as follows: Under U.S.S.G. § 2B1.1(a)(1), the base offense level for the defendant's conduct is 7. Under U.S.S.G. § 2B1.1(b)(1)(C), the fraud loss caused and intended to be caused in furtherance of the criminal activity undertaken by the defendant was more than $15,000 but less than $40,000, resulting in a 4-level increase to the base offense level. Under U.S.S.G. § 3B1.3, the defendant abused a position of public trust, resulting in a 2-level increase to his base offense level. Because the defendant demonstrated acceptance of responsibility for his offense, he receives a 2-level downward adjustment under U.S.S.G. § 3E1.1(a). This results in a total offense level of 11. The defendant is in Criminal History Category I, yielding a sentencing guideline range of 8 to 14 months.

### Consideration of the 3553(a) Factors

#### (1)  The nature and circumstances of the offense

The nature and circumstances of Turner's criminal conduct are serious. Turner was a management employee with SEPTA who abused his position to defraud SEPTA through a credit card system designed to allow respected management employees to obtain necessary materials for important projects. Turner betrayed the trust placed in him and deprived SEPTA and the citizens who rely on public transportation funds that should have been used for SEPTA's legitimate needs. Crimes like this do tremendous damage to federally funded agencies like SEPTA. They cause the taxpayers and citizens of

Philadelphia to lose faith in the integrity of one of the largest metropolitan transportation organizations in the country. People are already cynical about government and government-funded entities like SEPTA, and internal fraud and bribery activity as charged in this case, fans the flames of this cynicism. Internally at SEPTA, these crimes demoralize the dedicated, honest, and hard-working employees who worked with and for the corrupt supervisors charged in this case. SEPTA has expended and will continue to expend substantial financial and psychic resources trying to repair the damage from the fraud and ensure that it does not happen again.

SEPTA provided a victim impact statement, signed by Denise S. Wolf, Inspector General, and Robin Deveney, Director, Procurement & Supply Chain Management Audit, in which they expressed the ways in which this crime damaged the organization:

> The criminal fraud executed by nine bad actors damaged this organization, its employees, and the members of the public who rely on us for their transportation needs. To put it simply, it hurt a lot. We still feel the impact --- financial loss, decreased morale, and damaged reputation -- and the effects of this fraud on the organization are not going away any time soon. SEPTA is not a for-profit enterprise; it relies heavily on funding from taxpayers to subsidize the fares received from riders. We depend on the integrity of each of our employees to steward these public funds and provide transit services to millions of riders. When employees – even if only a small number -- violate this public trust, the damage to our organization is tremendous.

This was obviously a serious crime that had a substantial impact on the victim, and the government's sentencing recommendation appropriately accounts for this sentencing factor.

**(2)     The history and characteristics of the defendant.**

Defendant Turner is a 60-year-old resident of Philadelphia who had a good upbringing. Sadly, in 2021 he lost his partner of many years (and mother of his children) in a car accident. He lives with his three children from this relationship, who are between the ages of 13 and 18. The defendant has had some challenges in the past with drug abuse but is now sober. He does not have any criminal convictions. The defendant's history does not explain his decision to engage in this criminal conduct. Given his family history and the important job he held at SEPTA, he certainly should have known better than to engage in repeated acts of fraud over several years. The government's recommendation of a guideline sentence would properly account for the defendant's history and characteristics.

**(3)     The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and**

**(4)     The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

A sentence within the guidelines under all the facts and circumstances of this case would appropriately punish the defendant for defrauding SEPTA. The government also appreciates that the defendant is losing his pension as a result of the convictions here. The penalties imposed in this case will promote respect for the law and deter public employees who might contemplate engaging in this type of fraud from doing so. Crimes

like this are difficult to detect, as evidenced by the length of time that the defendant and others engaged in the fraud here. This Court needs to strongly deter those who would consider engaging this type of criminal behavior or otherwise abuse their positions as public employees.

> **(5)   The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

There is no need in this case to provide the defendant, a skilled and experienced former maintenance manager, with educational or vocational training. Thus, this statutory factor should not affect the Court's sentencing determination.

> **(6)   The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

Imposing a guidelines sentence would not result in any unwarranted disparities. Given the defendant's modest guideline range and the other factors discussed in this memorandum, the recommended sentence would not result in any unwarranted disparities among similarly situated defendants. The recommended sentence fairly considers this defendant's conduct and circumstances of his case relative to that of his co-defendants. The defendant is in the lower of two tiers of SEPTA manager defendants in this case. In particular, Abell, Martinez, and Kish participated in more serious criminal activity, received substantially more fraud proceeds, and were at a higher level in SEPTA management. Turner is in the group of lower-level managers, including Brady and Brauner, who participated in the fraud, but Turner also did not admit to his misconduct as

13

readily as Brady and Brauner did. Turner also received over 65 different products and services as part of the fraud, over a 3-year period, which meant he was repeatedly engaging in criminal conduct, and doing so more frequently than Brady and Brauner.

**(7)** **The need to provide restitution to any victims of the offense.**

Given the relatively short period of time that the defendant faces under the guidelines in this case, this Court need not otherwise fashion a sentence that considers the need for the defendant to pay restitution. Under the terms of the plea agreement, the defendant should be ordered to pay restitution of $27,650 and forfeiture of $20,512.

**V.   SENTENCING RECOMMENDATION**

For all the reasons set forth above, the government requests that this Court impose a sentence of imprisonment within the range of 8 to 14 months. Such a sentence would properly reflect consideration of all the sentencing factors.

Respectfully submitted,

JENNIFER ARBITTIER WILLIAMS
United States Attorney


*s/ Louis D. Lappen*
LOUIS D. LAPPEN
Deputy United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been filed on ECF and served via email upon:

>Joseph Capone, Esquire
>2332 South Broad Street
>Philadelphia, PA 19145
>E-mail: joseph@caponelawyers.com

>*/s Louis D. Lappen*
>LOUIS D. LAPPEN
>Deputy United States Attorney

Date:  May 4, 2022